Argued October 3, reversed and remanded December 5, 1950,
petition for rehearing denied January 4, 1951

# LAING *v.* SCHOOL DISTRICT NO. 10 OF JACKSON COUNTY

224 P. (2d) 923

*Edward C. Kelly,* of Medford, argued the cause and filed a brief for appellant.

*Jeannette E. Thatcher,* of Medford, argued the cause and filed a brief for respondent.

Before LUSK, Chief Justice, and BRAND, ROSSMAN, HAY, LATOURETTE and WARNER, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff from a judgment of the Circuit Court, entered upon a directed verdict, in favor of the defendant. The action which ended in the judgment was brought to recover damages for the alleged breach of a contract by the defendant.

The plaintiff submits only one assignment of error. It follows:

"The Court erred in directing the jury at the conclusion of plaintiff's case in chief to return a verdict in favor of the defendant, and in entering judgment thereon in favor of defendant herein and against plaintiff."

The plaintiff is an architect. The defendant is a school district of either the second or third class: § 111-802, O. C. L. A.

This action is based upon a contract which the plaintiff and the defendant signed September 9, 1947. In the summer of 1947 the defendant desired to enlarge its schoolhouse by adding a gymnasium, a kitchen and a lunchroom. Pursuant to the terms of the agreement of September 9, 1947, the plaintiff undertook to prepare the needed plans and specifications. It is conceded that he prepared plans and specifications for a gymnasium, kitchen and lunchroom, but the defendant claims that it is not bound to pay for his work because the structure which he designed could not have been built with the money which the defendant could lawfully spend. The building which he designed was never built, and his papers were returned to him.

It is immaterial in this case whether the defendant is a district of the second or third class. The plaintiff concedes that it is not a district of the first class. The defendant's board of directors, as permitted by Oregon Laws, 1945, Chap. 79, which amends § 111-809, O. C. L. A., consists of three directors of whom one, P. G. Pedersen, is chairman. We shall now quote the statutes which are applicable to this case and will then make a summary of the evidence. The defendant presented no evidence.

Section 111-1014, O. C. L. A., as amended by Oregon Laws, 1947, Chap. 352, reads as follows:

"If authorized by a majority vote of the legal voters present, at any legally called school meeting the district school board shall purchase, lease, repair or build schoolhouses, * * * and other necessary buildings, * * * and for such purposes may,

when so authorized, levy not oftener than once a year, a tax not exceeding five per cent of the assessed value of the property of the district, or issue or sell negotiable bonds as provided by law. * * *''

Section 111-1016, O. C. L. A., referring to the board of directors, says:

"When authorized by a majority of the legal voters present and voting by ballot at any legally called school meeting, they may, in the name of and on behalf of their district, contract a debt by borrowing money, or otherwise, for an amount which shall not exceed five thousand dollars ($5,000) and which together with outstanding bonded indebtedness shall not exceed five (5) per cent of the value of the taxable property of the district, for the purpose of building and furnishing a school building * * * and issue negotiable interest-bearing warrants of their district, evidencing such debt, * * * ."

Oregon Laws, 1947, Chap. 230, says:

"Notwithstanding the provisions of sections 111-1016, 111-1703 and 111-3158, O. C. L. A., any school district of the state of Oregon may, until July 1, 1949, incur bonded or negotiable warrant indebtedness not to exceed 10 per cent of the total assessed valuation of all of the taxable property in any such school district. After July 1, 1949, such debt limitations shall revert to the amounts set forth in the above-named statutes."

(Oregon Laws, 1949, Chap. 8, which is not applicable to this case, amends the statute just quoted.)

Section 111-327, O. C. L. A., says:

"* * * It shall be illegal for any school district of the third class to erect a school building until the plans for the same have been approved by the county superintendent of the county in which the district may be situated."

The total assessed valuation of all of the taxable property in the defendant school district in 1947 was $466,652.57. Ten per cent of that amount, $46,665.25, was therefore the total amount of indebtedness which the defendant could incur under Oregon Laws, 1947, Chap. 230.

The contract which the parties signed September 9, 1947, referring to the defendant as owner, stated: "The Owner intends to erect Gymnasium, Dining Room & Kitchen." It described the contemplated construction in no other manner; that is, it mentioned nothing about the dimensions, cost or other feature of the proposed building. Referring to the plaintiff, it said: "The Architect agrees to perform, for the above-named work, professional services as hereinafter set forth." It then described the services which the defendant agreed to perform and specified the compensation that he should receive.

The relationship of architect and principal which subsequently developed into this lawsuit had its inception June 17, 1947, when Mr. Pedersen, chairman of the defendant's board of directors, called upon the plaintiff and stated that the defendant wished to add to its schoolhouse a gymnasium, dining room and kitchen. Evidently Mr. Pedersen had not determined the size of the structure which the defendant wished to build, for he could supply the plaintiff with no details concerning the desired work except the size of the basketball court around which the gymnasium should be built. The following day the plaintiff went to the defendant's schoolhouse and viewed the premises.

Prior to a meeting of the defendant's board of directors which was held July 8, the plaintiff prepared three sketches of the proposed improvement. Although

the plaintiff termed them sketches, a layman would deem two of them plans and the third a drawing of the outside of the proposed building. One of the sheets showed the suggested room arrangement for the basement floor and the other the room plan for the main floor, including the gymnasium. The plaintiff swore that at the meeting of the defendant's board which was held July 8, 1947, he showed his sketches and that the board approved them. He also swore that the county school superintendent gave his approval.

Upon the tender of the plaintiff, the minutes of the meetings of the defendant's board of directors, which were concerned with the relationship between the plaintiff and the defendant, were received in evidence. Those for the meeting of July 8 recite the following:

> "* * * Mr. Pedersen showed the plans of gym and it was discussed * * *. As soon as the plans are completed and the amount of the bond known a special meeting will be called of the board members, Mr. Farrell and Mr. Laing, and the arrangement will be made for the bond election."

The minutes of a board meeting which was held July 17 recite that a resolution was unanimously carried which called

> "a school election for the purpose of submitting to the legal voters of the district the question of contracting a bonded indebtedness for the district in the sum of $30,000 for the purpose of providing funds with which to construct an addition to the present school building and equip and furnish the same in and for said district."

The minutes add that August 6, 1947, was selected as the time for the election, and, going on, declare:

> "Mr. Nelson made a motion that Mr. Laing be the architect at a fee of 6% of costs and he be retained to prepare plans and specifications and check

the accounts. These services to be contingent upon approval and sale of bonds. Motion carried.''

The record shows that at the election held August 6, 31 votes were cast in favor of the construction of the building and the incurrence of the indebtedness, and 23 adverse to the proposals.

The bonds authorized by the election were sold. It appears that the defendant, in addition to their proceeds, possessed $5,000, but the clerk of the defendant school district testified that since that sum had not been appropriated in the school budget to any purpose, it was unavailable for expenditure.

The minutes of a board meeting which was held September 9, 1947, state: ''An agreement was signed with Mr. Laing and he plans to advertise for contract bids which will close September 29.'' Although the contract was not signed until September 9, the plaintiff, as we have indicated, prior to that day had begun the preparation of the working drawings and specifications essential to the construction of the proposed structure.

When the working drawings and specifications had been completed, a call was issued for bids. The result is thus noted in the minutes of October 6, 1947:

''No regular bids were received, but Donald M. Drake Co. submitted an estimate of $79,647.00. Settergren, Wiley Co. estimate was $71,000.00.''

The minutes add:

''A discussion followed and plans are to be made to cut down cost of building to somewhere within our means.''

The plaintiff explained that at the time when the call for bids was issued, material men refused to quote

prices for future delivery and, therefore, contractors hesitated to enter bids. He deemed the tender received from Donald M. Drake Company a bid and, referring to it, testified: "Drake's was the only bid that was legitimate." All of the tenders were rejected. There is no claim that the building could have been built at any time since October 6, 1947, for $30,000.

Referring to the board meeting of July 6, when the plaintiff claims that his preliminary sketches received approval, he gave the following testimony:

"Q. Now, about that time did the board take any action during any of that time with reference to approval of an architect's fee or to retain you as an architect for the district in connection with the building?

"A. They couldn't legally do it until their bond issue had been approved."

He added:

"I was to be architect, subject to the approval of the bond issue."

Thus, we see that the plaintiff recognized that the board had no power to employ an architect for the construction of a building without first receiving authority from the voters.

With reference to the meeting which was held July 17, the plaintiff testified:

"I attended the meeting on the 17th when Mr. Farrell was there, deciding on their bond issue. I informed the board then that they didn't have enough money to put that building up and asked them to increase their bond issue. Mr. Pedersen informed me there was no reason to increase it because the voters would not approve it. That's the answer to that."

His words, "increase it", meant the proposed issue of $30,000.

We quote further from his testimony, as follows:

"Q. Did you form any opinion of your own as to the cost of building according to the plans as drawn just prior to the time of bidding? Had you formed an opinion of the minimum cost of the building?

"A. I did have a definite figure. I went before the board when they were determining their bond issue and told them they didn't have enough money to put the building up the way they approved it.

"Q. At that time they insisted thirty thousand dollars was all they could spend, is that correct? and refused to raise any more money?

"A. They told me there was no use increasing the bond issue because the taxpayers would not approve it.

\* \* \*

"Q. Isn't it a fact that you knew on July 17 that the building as planned at that time could not be built for thirty thousand dollars?

"A. That's why I went before the board meeting, to tell them so, at that meeting where they decided their bond issue.

"Q. You did not refuse to take the commission and draw a plan for them, did you?

"A. I had no reason to.

\* \* \*

"Q. They definitely told you they would not increase the amount of bonds?

"A. They didn't say so. They said the taxpayers wouldn't approve of it."

In a letter which the plaintiff wrote February 4, 1948, to the defendant school board, he said:

"Last June 17th your Chairman, Mr. Pederson called at my office and asked me to prepare Sketches

for a Gymnasium for your School, and he dictated the size that the basketball court was to be, which virtually determined the size of the Gymnasium. Then he told me, that to make the school qualify with the State Board of Education, the district had to provide a Dining Room and Kitchen. He mentioned that some contractor had told him such a building could be put up for $23,000.00 which I told Mr. Pederson was impossible, and he told me they would like to keep the cost around $30,000.00 * * *. I prepared the Sketches as requested to meet the Boards requirement. These sketches were approved by the Board, * * *. At no time was I asked by the Board to submit an estimated cost, and at the Board meeting held to determine the amount of the Bond issue, in the presence of Mr. Frank Farrell, the Boards Attorney and other present, who can bear witness to it, I told the Board that $30,000 Bond issue along with the $5,000.00 the Board then had in hand was not sufficient to erect the building as drawn and suggested that they increase the amount of the Bond issue. The reply I received from the Board was that the taxpayers of the District would not approve of a greater amount, and they determined on the $30,000.00 amount, even after I had advised them the building could not be put up for the amount available * * *.''

The foregoing renders it clear that by July 17 the plaintiff knew that the building outlined in his sketches could not be constructed for the amount which the district would realize from its contemplated bond issue. We also see from the foregoing that when the plaintiff told the board that its contemplated bond issue was for an insufficient sum, the suggestion, implied in his statement, was not adopted. To the contrary, Mr. Pedersen, chairman of the board, repelled the proposal with the explanation that ''the voters would not approve it.'' Evidently the rejection of the plaintiff's

suggestion was made by Mr. Pedersen in decisive tones, for the plaintiff, as a witness, added: "That's the answer to that." It is thus clear that almost two months before he signed the contract upon which this action is based, the plaintiff knew that the defendant would not have enough money to enable it to build the structure which he wished to design and that it would not seek a larger amount. When the plaintiff received the answer that "the voters would not approve it" he had prepared none of the working plans or specifications. He had at that time performed no work for which he now seeks recovery.

The clerk of the defendant school board, as a witness for the plaintiff, testified that the latter attended the board meeting on September 9, 1947. By that time the bonds had been sold. It was at that board meeting that the plaintiff presented for signature by the board the contract which we have described. He was its draftsman. The board's secretary, referring to the meeting of September 9, testified:

"We discussed that we had thirty thousand, and that if it took more than that, we, I am quite sure, made Mr. Laing understand that the district could not be bonded for any more, as the thirty thousand bond issue was passed by such a small margin they were very positive they wouldn't be able to raise any more money."

Thus, after the bonds had been sold and before the contract which underlies this action was presented for signature, the plaintiff was told again that $30,000 was the maximum of the available money. His suggestions that the board ask the voters for more money had again been rejected in his presence.

As a witness, the plaintiff made it clear that it was impossible to reduce the cost of constructing the build-

ing which he designed to the sum of $30,000 by merely omitting such parts as the cabinets, the marquee and the dumb-waiter. He frankly stated: "It would mean redrawing the plans and specifications." He explained that the building would have to be made smaller, some rooms omitted, the roof truss discarded and some features abandoned in order to bring the cost down to $30,000. We again quote from him:

"Q. In other words, you would have been up against the same operations you were for the original plans and specifications?
"A. Exactly."

It will be recalled that the minutes of the board meeting which recite the amount of the proposals received from contractors said:

"A discussion followed and plans are to be made to cut down cost of building to somewhere within our means."

The plaintiff, however, made no effort to revise his plans so that the cost of construction would be reduced to the amount of the available funds. Possibly his explanation, which indicates that in order to design a gymnasium, kitchen and dining room which could be built for approximately $30,000 would have required him to discard the plans and specifications already prepared and draft a new set, may account for his inaction. Evidently the school board, apart from awaiting action upon the plaintiff's part, was uncertain as to the course it should pursue. The minutes of a meeting held November 11, 1947, state:

"The building plans were discussed with Mr. Laing. It was decided to table the plans for the time being as the lowest figure was $45,000 and he is to mail us his bill."

Possibly the words, "the lowest figure was $45,000," meant the "lowest figure was $45,000 beyond the amount available." Following that meeting, the plaintiff sent the board a statement of account showing that he had earned $1,080.00. It was based upon "Amount of Bond issue—$30,000." Thus, the plaintiff accepted $30,000 as the basis for calculating his fee. The statement was accompanied with a letter which said:

"Of course, the Board understands that any money paid me now will be credited when the work is proceeded with, provided no further changes are made on the working drawings as now constituted."

The board replied in a letter, dated December 11, 1947, as follows:

"Inasmuch as you were unable to produce a design for a building which could be built for the money which we had told you was available, we do not feel that you have provided us with any service which would entitle you to any remuneration."

The defendant's board interpreted the plaintiff's statement as signifying that he demanded $1,080.00 for the work which he had performed in the preparation of the plans and specifications for a building which, it developed, could not be built. They also inferred that he would not revise his plans or prepare new ones for a structure which could be built for the available money without remuneration at the contract rate, in addition to the demanded sum of $1,080.00. Thus, they saw that if they satisfied his demands they would pay at the contract rate for two sets of plans and specifications. We think that the board correctly construed the plaintiff's attitude.

We see from the foregoing that the plaintiff demands payment for his work in the preparation of plans and specifications for a building which the defendant lacked money to construct. We also see that the plaintiff refused to design a $30,000 structure unless, in addition to being paid for his work in designing it, he would also be paid for his services in designing one that the defendant could not build. When matters reached the juncture just mentioned, the defendant returned to the plaintiff everything which it had received from him, and sometime after March 1, 1948, had a contractor, who made no use of the plaintiff's work, construct the annex. The plaintiff was given ample notice by the defendant of its intention to abandon his services unless he revised his plans so that it could build with the available money the structure which he had suggested. This notification brought no revision of the plans. Sometime later the plaintiff filed this action.

This action is based upon the premise that the plaintiff is entitled to judgment for the work which he performed in preparing the plans and specifications we have described. He does not seek the full contract price which is set forth in the agreement of September 9 because the sum fixed in that instrument includes compensation for work which he did not perform, such as the supervision of construction, and the keeping of accounts between the defendant and the contractors. It is apparent that the plaintiff, to be entitled to judgment, must show that the defendant's board had power to contract lawfully for the preparation of plans and specifications entailing construction of a building costing more than the sum voted by the taxpayers.

The above will suffice as a review of the record.

The plaintiff, in endeavoring to show that he established a cause of action, depends much upon *Bergholtz v. City of Oregon City,* 116 Or. 18, 240 P. 225, which he describes as "directly in point." The plaintiff in that case, an architect, submitted plans to the defendant for a city hall which were accepted, provided the structure could be built for $35,000. We now quote from the decision:

"The testimony shows that, at the direction of the city council, the plaintiff advertised for bids for the construction of a city hall, all of which were rejected because they were above the sum of $35,000. Following the receipt of the bids, the plaintiff, at the request of the city council, made changes in his plans and specifications that would have reduced the cost of construction of the building, and there is testimony tending to show that under the revised plans and specifications the city council could have constructed the building for $35,000."

The city, however, selected a new site for its building and never used the plaintiff's work. We think that the fact that the plaintiff, at the request of the city council, revised his plans and specifications so that his proposed building could have been built within the cost limitation distinguishes that case from this one.

Concerning the Bergholtz case, the plaintiff's brief says:

"The Court held in the Bergholtz case that the question of the architect's recovery under his agreement where the work was abandoned before completion, was properly submitted to the jury and that in that case, as in the ordinary case, it was for the jury to say whether such revised plans, drawings and specifications would be reasonably near the funds the district had available for construction. We respectfully submit that this ques-

tion should have been submitted to the jury for determination in the case at bar.''

In the instant case, the plaintiff freely conceded that he at all times knew that the building shown by his plans and specifications could not have been built with the available funds. Unlike the Bergholtz situation, this case presented no issue of fact upon that phase for submission to the jury.

██ It has been so many times pointed out that municipal corporations of the type of the defendant possess only the powers that are expressly conferred upon them by statute and others necessarily implied from the conferred powers, that no citation to authority is needed to support the statement of that simple rule. Those who contract with such bodies are charged with notice of their limited powers: *Tuttle v. Beem*, 144 Or. 145, 24 P. 2d 12. In this case, the plaintiff, as a witness, conceded that he knew that the defendant could not contract for the construction of a building, including his architectural services, without first securing authority from the voters. He also knew that the voters had placed at the disposal of the defendant's board of directors, for the construction of the desired building, $30,000, and no more.

█ We think it is clear from the combined effect of Oregon Laws, 1947, Chap. 230, and § 111-1014, O. C. L. A., as amended by Oregon Laws, 1947, Chap. 352, that the defendant's board of directors had no authority to build a structure costing more than $30,000.

In *Cooper v. City of Derby*, 83 Conn. 40, 75 Atl. 140, a problem similar to the one before us was decided. The court said, in part:

"* * * It proved that to carry them out would be beyond the means at its disposal, and for that

reason it did not accept them. The plaintiff, in dealing with a committee appointed by the Legislature, was bound to know the limits of their authority to bind the city. It could not have carried out his plans without exceeding that authority. He therefore could not complain that they were not accepted. Nor can he recover upon a quantum meruit. No plans were wanted, or would have been of service, which called for more money than the committee could contract to pay. His did."

In *State ex rel. v. Pratt*, 31 Wash. 2d 725, 198 P. 2d 814, the court held that a county was not liable for architectural services which were rendered in designing a courthouse which could not be built with available moneys. The decision said:

"The basic fact in this case is that the county commissioners did not have authority to secure the services herein rendered in aid of building a courthouse that would cost an amount in excess of the public debt that could be constitutionally incurred. It is immaterial whether the contract had in it the clause calling for a building at the estimated cost of $600,000 or not. For even though no amount was inserted in the contract, still the appellants were put upon notice of the commissioners' statutory authority and knew that they could not build a building for $1,400,000. The contract if treated as for a building to cost $1,400,000 was therefore ultra vires and the appellants performed their labors at their peril. See Stoddard v. King County, 22 Wash. 2d 868, 158 P. 2d 78; Green v. Okanogan County, 60 Wash. 309, 111 P. 226, 114 P. 457; and Northwestern Improvement Co. v. McNeil, 100 Wash. 22, 170 P. 338.

"On the other hand, if the contract be treated as one for the building of a courthouse, for an amount within their power to build, then the appellants have not performed their contract in submitting plans

for a building at an estimated cost that was beyond it. The trial court was therefore correct in refusing to require the county auditor to issue the warrant.''

■ A comprehensive annotation in 127 A. L. R. 410 says:

"Where an architect is employed by the state or by a political subdivision thereof, it has generally been held that he may not recover compensation for preparing plans for a structure which will cost more to erect than such governmental unit is permitted by law to expend for the purpose."

It must be apparent in this case as in *State v. Pratt*, supra, that if the parties contracted for plans and specifications for a building to cost more than $30,000, the defendant's board of directors acted ultra vires and the contract is unenforceable. But if the parties contracted for the plaintiff's services for a building to cost $30,000 or less, the plaintiff did not perform his contract, for he submitted no designs for a structure of that kind.

■ We do not believe that it can be said that the defendant's board of directors wittingly contracted for a structure to cost more than $30,000. The preliminary sketches which were shown to the board members indicated nothing about such costly features as heating and lighting. Nor did they show the proposed type of roof or the equipment in the nature of conveniences which the plaintiff incorporated into his working plans. In truth, so far as the record indicates, the board was never shown, and never approved, the working plans. Being uninformed concerning the matters just mentioned, the board could not itself have estimated the cost of constructing the building, even if the board members were competent to estimate construction costs. The board did nothing more than to adhere

steadfastly to its position: that there would be available for construction costs no more than $30,000. Why the plaintiff, who appears to be a competent architect, went ahead, in the face of the board's firmness, and prepared plans and specifications for a building which he knew the defendant could not build, we do not know. It is clear, however, that in pursuing his course he was not performing his contract, and that he is entitled to no compensation for his work. A tailor who makes a suit of clothes for a midget which can fit only a giant, and which is rejected when made, can collect nothing for his work, either upon contract or quantum meruit. The plaintiff has done nothing for which the defendant has authority to pay. He has not performed his contract.

As we have said, the attacked judgment is based upon a directed verdict. Immediately after plaintiff's counsel said "Plaintiff rests", defendant moved for a directed verdict. The defendant did not precede its motion with an indication that it, too, had rested. The presiding judge at that point inquired of defendant's counsel: "You are moving for an involuntary nonsuit; is that right?" and received the reply, "I think that would be right." Then the motion was argued, but, before a ruling was made, the plaintiff, with the consent of the trial judge, reopened his case and resumed the witness stand. After he had given some additional testimony and had again retired from the witness stand, defendant's counsel said: "I renew my motion." Presently plaintiff's counsel returned his client to the witness stand and, after some more testimony had been given and the plaintiff had again withdrawn from the stand, defendant's counsel said: "I would like to renew my motion." At that point the presiding judge,

over objections of plaintiff's counsel, directed the foreman of the jury to sign a verdict for the defendant.

We think it is evident that error was committed when a verdict was directed for the defendant. The motion for a nonsuit should have been sustained: §6-201, O. C. L. A., as amended by Oregon Laws, 1941, Chap. 313, §1. The attacked judgment is reversed. The cause is remanded to the Circuit Court with instructions to (1) vacate the judgment; (2) sustain the motion for a nonsuit; and (3) enter a judgment for the defendant based upon the order sustaining the motion for nonsuit.