**BAYLOR UNIVERSITY, Appellant,**

v.

**Guy A. CARLANDER, Appellee.**

No. 15359.

Court of Civil Appeals of Texas.

Dallas.

June 27, 1958.

Rehearing Denied Oct. 3, 1958.

Abner V. McCall, Waco, Burford, Ryburn & Ford, Sam P. Burford and Clarence A. Guittard, Dallas, for appellant.

Spafford, Spafford, Freedman, Hamlin, Gay & Russell; Donald G. Gay and Franklin E. Spafford, Dallas, for appellee.

YOUNG, Justice.

The suit of appellee architect was for compensation allegedly due under a written contract of employment of date March 10, 1949; the trial court rendering judgment upon jury issues in his favor and against defendant Baylor University for $92,657.42, inclusive of interest to March 25, 1957, attorney's fees and travel ex-

penses, after allowance for credits. The recovery was based upon $4\frac{1}{2}$ percent of the "lowest bona fide bid" ($1,511,194, Lump Sum), as well as the usual reasonable and customary compensation for furnishing completed plans and specifications in accordance with "preliminary studies". Subject matter was the proposed construction of Tidwell Bible Building on Baylor University Campus at Waco.

After pretrial and sustaining of special exceptions to defendant's third amended original answer, its principal fact defenses consisted of alleged fraudulent representations made by plaintiff to defendant's Building Committee in oral statements, letters and conduct concerning cost of the contemplated building, on which they relied; in effect, that such cost would not be substantially in excess of $600,000, and that in consequence of the fraud and misrepresentation plaintiff was not entitled to recover anything under said contract.

Fact questions raised by the testimony and pleading of the respective parties on which they went to trial are reflected in the jury issues and answers; in summary, that (1) the usual, reasonable and customary compensation for all work designed and specified by plaintiff and abandoned by defendant was $68,003.73; (2) after March 10, 1949 (date of contract) plaintiff made trips authorized by defendant; (3) the reasonable expense incurred and paid by plaintiff in connection with such authorized travel was $1,130.73; (4) defendant had knowledge or belief by August 9, 1950 that the proposed building designed by plaintiff would cost substantially in excess of $600,000; (5) defendant had knowledge by August 9, 1950 that would cause a reasonably prudent person to believe that the proposed building designed by plaintiff would cost substantially more than $600,000 to construct; (6) plaintiff, in continuing to work upon final plans and specifications *did not* rely upon the letter from Guy Newman of August 18, 1950; (7) a reasonable attorney's fee for plaintiff's attorneys was $10,000.00; (8) plaintiff Carlander *did not* represent to defendant's building committee that cost of the proposed building shown in preliminary drawings, identified as plaintiff's Exhibits 2–6, would not be substantially more than $600,000. Issues 9, 10, 11 and 12 were conditional on issue 8 and not answered. (13) Plaintiff, in exercise of that degree of care and skill ordinarily exercised by a competent architect under the same or similar circumstances, should have known that such representation, if any, was false (referable to issue 8); (14) plaintiff, before signing the written contract in question, represented to defendant's Building Committee that in the event the entire building shown in preliminary drawings identified as plaintiff's Exhibits 2–6 could not be constructed for $600,000, a usable portion of such building could be constructed for such amount; (15) such representation was true. Issues 16, 17 and 18, conditional and not answered. (19) Plaintiff, in exercise of that degree of care and skill ordinarily exercised by competent architects *should not* have known that such representation was false; (20) plaintiff and defendant's Building Committee on November 2, 1948 agreed that the $6,000 payment theretofore received by plaintiff was in full payment for all services rendered by him up to that date; (21) after March 10, 1949, date of the written contract, plaintiff *did not* unreasonably delay completion of final plans and specifications of the building in question; issue 22, conditional, not answered; (23) when the bid of Farnsworth & Chambers was opened plaintiff advised defendant's Executive Committee that same was unreasonably high; (24) plaintiff acquiesced in and agreed to the rejection of such bid. (Note: The court's charge included the following instructions: "The term 'represent' means to make a representation. A representation may be express or implied and may consist of oral or written statements, concealment of information, or other conduct, intended to lead another person to believe in the truth of a particu-

lar matter of fact." And relative to jury answer to above issue No. 4, it is conceded in the record that defendant had as much information concerning cost of the proposed building in March 1949 as it had on August 9, 1950.)

Appellant's first seven points complain of the court's ruling on special exceptions whereby certain allegations were stricken from defendant's answer; allegations, in effect, (1) "that plaintiff was in a position of trust and confidence and failed to make a full and complete disclosure of his opinion and belief that the proposed building would probably cost far in excess of the figure he knew defendant intended to spend"; (2) "that an essential term of the agreement between the parties, though not included in the written contract, was that the plans for the proposed building should be prepared in such a manner that the building could be completed with the funds available for that purpose, and that plaintiff failed to prepare the plans in such manner"; (3) "that the written contract was incomplete and ambiguous in that it did not describe particularly the proposed building, and that the parties intended that the building be designed so that it could be erected substantially with the funds available"; (4) "that plaintiff failed to comply with defendant's instructions concerning the cost of the proposed building"; (5) "that if it was not feasible to carry out defendant's instructions concerning the cost of the building, plaintiff had the duty to advise defendant of such fact and request further instructions, but that he failed to do so"; (6) "that plaintiff failed to carry out his contract with that degree of care and skill required of an architect, in that he failed to follow the usual and customary practice in the architectural profession to take into consideration the owner's known financial resources and either design a building in keeping with such resources, or advise the owner that the owner's instructions concerning the building could not be carried out within such resources"; (7) "that defendant's Building Committee had no authority to enter into a contract with plaintiff to prepare plans for a building with no limitation of the cost."

The remaining nine points of error relate to the court's rulings during course of trial; such as improper restriction on cross-examination of plaintiff; argument of plaintiff's counsel, erroneous rendition in plaintiff's favor for $68,003.73 on various grounds, and lastly to issue No. 1, that the inquiry should have been directed to value of plaintiff's services rather than to the "usual reasonable and customary compensation."

It will be observed that defendant's defenses of fraudulent representations were disposed of adversely to it, which jury findings have not been attacked. Appellant's primary point above relates to the defense of "full disclosure" (stricken on exceptions); pled, not as a species of fraud, but as a duty implicit in all contracts between architect and client; in that it was Carlander's opinion and belief at all material dates that cost of the proposed Bible Building would be far in excess of defendant's known available funds ($600,000), a belief not disclosed to defendant, resulting in the furnishing of plans and specifications that were worthless. The contract in question contained no cost limitation; plaintiff's exceptions treating defendant's asserted defenses generally as an attempt to vary by parol the terms of the written contract, and therefore properly stricken.

Background of the controversy must be detailed at some length, considering nature of appellant's points and long relationship of the parties on the particular project—Tidwell Bible Building, so named in honor of the late Dr. Tidwell, a revered Professor of Theology at the School. Appellee, a son-in-law of Dr. Tidwell, was first employed by defendant's Building Committee in 1944 upon launching of plans for such a Memorial, furnishing a number of preliminary drawings in 1947 when a campaign to raise $600,000 was in progress. In July 1948 the original Building Commit-

tee resigned, with George O. Jones, Chairman of the successor Committee. Appellee was requested to re-study his plans in keeping with the most effective use of money available; the Committee Minutes indicating a plan to spend $600,000 on the building. On November 2, 1948, meeting with the Committee, plaintiff exhibited designs of a proposed Bible Building of 79,660 square feet, which was discussed at length. Limitation of building cost to $600,000 was mentioned, plaintiff stating that under his plans it was impossible to erect the building for such amount.

Carlander was again instructed to submit plans for the same footage, but limited to a $600,000 building; the discussion becoming heated, the architect offering to resign. At this meeting, according to Chairman Jones, it was emphasized that the Committee did not want to go in debt for the building, hoping to have $600,000 available, with $350,000 on hand at the time; that plaintiff was advised to change his plans to meet the situation, the latter making no estimate of cost of building shown on his then plans; Jones also telling Carlander that buildings comparable to what they wanted had been constructed on Baylor Campus for $10 a square foot, with reply by plaintiff that such was not the case in Amarillo where he lived. At the meeting of the Building Committee next day, November 3, as Mr. Jones testified, Carlander was asked to continue as Architect, being told to cut size of building to 60,000 square feet; plaintiff suggesting plans for going ahead with the project in part, to be completed when funds were available, the Committee advising that they wanted a complete building of around $10 per square foot value; plaintiff responding that he would see what could be developed along that line.

Later correspondence between the parties to date of contract, March 10, 1949, or excerpts therefrom concerning building plans should be noted. On November 29, 1948 plaintiff wrote Dr. Melton, President, Board of Trustees, and referring to a previous conversation, said: "The reason for my bothering you as I did on Saturday was that you would have a little time to think over two ways of building the Bible Building. 1. Merely reduce the size of the building to $600,000 or thereabouts, or 2. Maintain the present carefully-worked-out program and building an initial portion of this building to the extent of whatever $600,000 or thereabouts would construct. This plan would provide for future expansion and growth of the Bible Department by merely adding to whatever is built on the first or initial program." Dr. Melton answered, after conferring with members of the Building Committee; suggesting the building be not cut down in size but instead that modifications be made because some of the features were "most too expensive in the light of our funds and prospects," and that "the tower and west wing should be built and completed, leaving the east wing for a later date." A letter of Jones to Carlander requested sketches for "a building more compactly designed." Reply of Carlander asked for instructions on several points, with the question "Is this reduced Bible Building to be the ultimate and complete Bible Building?"; the answering letter of Jones of December 29, 1948 being quoted in greater part: " * * * In reply to the questions in your letter, I believe I am expressing the unanimous opinion of the committee in saying that we would like a building containing all of the rooms and departments provided for in the original building. This included twelve classrooms, twentyfour offices, great commission room, library and reading room, auditorium, and radio department. * * * In addition to the above enumerated rooms, I am advised that there should be a reception or a lounge room, and all of this should be contained in a building of a maximum of 60,000 sq. ft. The height of the tower portion of the building will be up to the architect for suggestions, but I believe the majority of the committee prefer the tower with the glass front and the lighting features as provided in the original plan. It is hoped that the Bible Building as outlined above can be

constructed with the money which will be available to us, and that it will constitute a complete Bible Building in so far as we can now make our plans. * * *." And on February 21, 1949 Carlander wrote Mr. Jones, in part as follows: "* * * Now, as I understand it, we have again been asked to plan a building for ground between Speight and James, and not move the Little Theater for the present time. We have also been instructed to incorporate all the units planned in 1947 and 1948, keeping the Tower design, Cross Feature, etc., yet reduce the total floor area to approximately 60,000 square feet. I am glad to tell you that we think we have reached a solution that will do what we have been told to do. Somehow we have a feeling that the solution will solve your problem and meet with your approval—that of the committee and those most deeply interested in the Bible Building. * * * Most of the drawings are completed and ready for final touches and adjustments. * * *."

On March 7, 1949 plaintiff met with the Building Committee, presenting revised preliminary plans which were accepted and named members were authorized to execute a contract with the architect. Such plans reflected a building smaller in size than earlier drawings, left wing entirely eliminated, floor area first shown as 61,957 sq. ft. but later corrected to show a true area of approximately 65,000 sq. ft. Cost of building under the revised plans was discussed.

According to defensive testimony, Carlander was asked by Committee members if the building could be completed with the money available; he not saying whether it could or not, but that the cost would be "slightly" more than $10 a square foot. Mr. Jones suggested that a limitation of $600,000 be written into the architect's contract, opposed by Carlander; others of the Committee expressing opinion that it was impossible at that time to tell what the cost would be, whether slightly more or less than $600,000; and that the Committee would not know until bids were received; that in a discussion of whether the building as designed could be completed with funds available, Carlander said the structure could be partially completed then, with full completion at a later date; some member of the Committee observing that the "Union Building" had cost approximately $10 per square foot; Carlander stating that this building would cost more but not saying how much. According to another Committeeman (Dr. McKnight), Carlander had been previously requested to make a cost estimate on his plans for the proposed building, but had not done so; saying only that it would cost more than $600,000; that in overruling Mr. Jones on a $600,000 cost limitation to be placed in the architect's contract, others of the Committee commented that the cost might run 10% or 15% more than that, but had faith in Mr. Carlander to carry out the Committee's wishes without such restriction.

On the other hand, plaintiff testified on cross-examination that there was no mention of square-foot cost at the meeting of March 7, 1949; giving his version of the discussion concerning cost of the proposed building as follows:

"A. They asked me if I could give them a figure on it. I told them I didn't have the computation, that I hadn't had time. They gave me the rush act and I told them I would be ready on March 8th. They rushed me and told me to cut it a day short and be there on the 7th. I had no chance to make it and I told them * * *

"Q. You said you didn't tell them what the building would cost? A. I certainly did not.

"Q. You didn't tell them at that time that the building would cost over a million dollars, did you? A. I didn't make any figure at all to them.

"Q. You knew then that it would probably cost over a million, didn't you? A. Well, the way the market was going it could very easily.

"Q. And you held that opinion on March 7th, 1949, didn't you? A. I didn't form any opinion because I had no opportunity to compute it or check it, and the market was flying one way and the other.

"Q. Now, that was long before the Korean War started, wasn't it? A. Well, that was '49. '50 is when the Korean War started.

"Q. You couldn't bring yourself to tell that Committee that they couldn't build a building with this tower and wall of light for less than a million dollars; you just couldn't bring yourself to tell them that, could you? A. If I had it figured out it would be very simple to do it. I never concealed it from them.

"Q. Well, you didn't tell them, did you? A. No, I didn't tell them. I didn't tell them anything about what it would be. I told them I couldn't figure it out until I had time and they wouldn't give me time to figure it".

Next day, March 8, Carlander met with members of the Building Committee and discussed the architect's fee. The Form of Contract was before them, not yet signed, providing for a 20% payment when preliminary drawings were completed, based on 6% of a "reasonable estimated cost." According to Mr. Jones, the amount of $600,000 was taken as such a basis, plaintiff not demurring or claiming otherwise as to "estimated cost" at that time; and submitting a written statement to the Committee on March 10 as follows:

"To architectural services on Tidwell Bible Building in accord with terms of Contract for architectural services, Article No. 5, covering payment now due Architect.

"As suggested by Mr. George O. Jones and Mr. Claude Segrest at a meeting with Architect in the Roosevelt Hotel, Tuesday noon, March 8, 1949, the figure for a reasonable estimated cost as being $600,000 basis for this payment is being used.

| | |
|---|---|
| "The 6% fee on $600,000 would be | $36,000.00 |
| "20% of this fee now due is | 7,200.00 |
| "Previously paid on account | 6,000.00 |
| "Amount due this date | $ 1,200.00" |

Printed conditions of the contract sued upon include the following:

"1. The Architect's Services. The Architect's professional services consist of the necessary conferences, the preparation of preliminary studies, working drawings, specifications, large scale and full size detail drawings; the drafting of forms of proposals and contracts; the issuance of certificates of payment; the keeping of accounts, the general administration of the business and supervision of the work. * *

"4. Extra Services and Special Cases.— * * *

"If any work designed or specified by the Architect is abandoned or suspended the Architect is to be paid for the service rendered on account of it.

"5. * * * Payments to the Architect on account of his fee shall be made as follows, subject to the provisions of Art. 4:

"Upon completion of the preliminary studies, a sum equal to 20% of the basic rate computed upon a reasonable estimated cost.

"Upon completion of specifications and general working drawings (exclusive of details) a sum sufficient to increase payments on the fee to 75% of the rate or rates of commission arising from this agreement, computed upon a reasonable cost estimated on such completed specifications and drawings, or if bids have been received, then computed upon the lowest bona fide bid or bids.

"From time to time during the execution of work and in proportion to the amount of service rendered by the

Architect, payments shall be made until the aggregate of all payments made on account of the fee under this Article, but not including any covered by the provisions of Article 4, shall be a sum equal to the rate or rates of commission arising from this agreement, computed upon the final cost of the work.

\* \* \*

"8. Preliminary Estimates.—When requested to do so the Architect will furnish preliminary estimates on the cost of the work, but he does not guarantee the accuracy of such estimates.

\* \* \*

"15. It is accepted that preliminary studies for the Tidwell Bible Building as prepared and presented to the Building Committee on Monday, March 7, 1949, 12:00 Noon, at Student Union Building, in Waco, are approved and accepted, and that Architect is to proceed with the completion of specifications and general working drawings in accord with these preliminary studies. Copies of the five blue prints are on file with Dr. W. R. White, President of Baylor University."

Plaintiff proceeded with drawings of plans and specifications, experiencing some delays. He met with the Committee in September 1949 to report on progress, making extensive notes inclusive of the following: "II. Building Cost. The cost of construction was discussed. The trend of costs for the past few months has been down. No definite figure as to the actual contract completed cost has been set up. Some of the Committee suggested that $10.00 per square foot of floor area would be a guess guage, using the Student Union Building as guage. The architect stated that he doubted if $10.00 would cover completed costs.

"The Student Union is a well built and of good fireproof construction classification. As such, it would be a good comparative guage and favorable. There are some added features and items in the Bible Building, however, that will cost more. More controls and zoning of air conditioning are wanted. More electrical work will result from flood lighting, wall of light, radio studios, and television electrical load. Not all of TV and radio are to be considered in first contract even though plans are to be complete and inclusive. Certain parts will be designated by Owner to omit by deductions from contract price.

"The plans will contain somewhere between 63,000 and 65,000 square feet of floor area as presented to Committee this date.

"Dr. Melton remarked that we would not know the cost until plans are completed. Dr. McKnight added, and until bids are received. Architect agreed that no real estimate can be made until plans and details have been worked out and put into plans for construction."

Diverse views of the parties relative to building cost and plaintiff's duties under his contract of employment were first brought to issue in an exchange of letters (Jones to Carlander and reply) of August 1950— here quoted. The Jones letter:

"I have just had a conference with the Auditing Department of Baylor University, and it appears now that the most optimistic estimate of the Funds available for the Tidwell Bible building at the time we place the plans for bids will approximately be $647,000. It is estimated that approximately $100,000 will be required for furnishing the building.

"You will recall that the architect was commissioned to prepare plans for a building that would cost not more than $600,000. In view of the fact that material costs are not going down, I thought it best at this time to call your attention to the fact that $600,000 will probably be the maximum amount we will have to spend for the construction of our building.

"In order to save the time that might be required for revision of plans after asking for bids, I thought it would be well for you to have these facts in mind so that if a re-

vision is necessary, it could be taken care of at this time.

"If I interpret the attitude of the Board of Trustees correctly, they will not be willing for the University to shoulder any part of the cost of the Tidwell Bible Building, but will expect us to build it and equip it with funds contributed for that purpose."

Answer of Carlander:

"Your letter dated August 9, 1950, received. I am greatly surprised at its contents. Please review our correspondence, meetings, and our contract.

"I feel certain that you will find that the Architect was employed to design the Bible Building according to certain approved plans for the Building—not a certain-priced building.

"In one of our meetings Dr. Melton made the statement that we would not be able to determine the cost of the Bible Building until plans were completed. Dr. McKnight added, 'And until we receive bids for same.'

"At this time the Architect stated that we could and would provide alternates in bids for a complete building, and also for certain omissions, and even areas that could be left unfinished. This method gives the Owner the choice of building as much building as funds will permit without borrowed funds.

"Plans are now nearing completion, and any attempt to change the overall final plans would be very costly. We certainly will do all we can to cooperate. In order that you personally are not misinformed, I am attempting to clear up and re-state that Architect was employed to proceed to develop plans for the Building according to certain approved plans, and not for a definite total completed cost. Our contract is clear in this respect."

On March 28, 1951, Carlander presented complete plans and specifications to the Committee, Board Minutes authorizing him to submit same to contractors for bids with instructions inclusive of the following: "1.

The Owner desires to award a contract for the Bible Building within the funds now on hand for this project. For that reason the project is divided into several alternates as well as a Base Bid. 2. Funds on hand are intended to cover the cost of the Architect's and the Engineer's fees as well as the base bid plus as many added alternates as possible. 3. As more funds become available, the intention of the Owner as of this date is to complete the entire project." Accordingly the contractor's "Base Bid" was confined to shell of the building and completion of first and second floor, except chapel; the contractors being instructed to make separate bids for completion of chapel and upper rooms, then a lump sum bid for completion of the entire building except tenth floor; the ten-story window or "Wall of Light" to be the subject of a separate contract and not included in the bids. On July 10 the Executive Committee of Board of Trustees, met to consider bids with only one forthcoming: that of Farnsworth & Chambers, Base Bid $1,101,427, lump sum bid, $1,511,194. Upon analysis the bid was rejected, Building Committee enlarged and ordered to re-study the situation. At this time there was some $628,000 in the Tidwell Bible Building Fund. There were subsequent discussions between plaintiff and defendant's representatives relative to revision of plans for a building commensurate with funds available, but without result. His plans, etc., were accordingly abandoned, another firm of architects employed, and a building was erected in 1953 at cost of $11.37 per square foot; plaintiff being given notice of dismissal in July 1952.

The final sheets of "Preliminary Studies" (Contract, paragraph 15) disclose a proposed structure, steel and masonry, ten-story, H-shaped, with unique features of glass and aluminum, tower, a "Wall of Light"; all drawn to scale showing dimensions of floor space in class rooms, offices, chapel, library, air conditioning and radio station space, etc., located between Speight and James Streets. It was from these designs

of the entire project in general outline that plaintiff was instructed to prepare and complete plans and specifications for the building in question.

We have set forth the dealings, conversations, and correspondence of the parties over the years of their relationship, perhaps at too great a length; made necessary perforce of defendant's claim of erroneously stricken pleading and defenses; in particular, as regards plaintiff's duty of "full disclosure". In such connection Carlander had testified to having been always of the opinion that cost of the designed building would be around "$20.00 per sq. ft"; also that such had been his experience in cost of comparable buildings at Amarillo where he lived; claiming that he so informed the Building Committee, which they denied. (At $20 per sq. ft., cost of the proposed building would have been approximately $1,300,000.)

■ Undoubtedly the relationship between these parties was fiduciary—one of trust and confidence. As stated in 3 Am. Jur., p. 1000, " * * * Good faith and loyalty to his employer constitute a primary duty of the architect. He is in duty bound to make a full disclosure of all matters, of which he has knowledge, which it is desirable or important that his principal should learn." 2 Tex.Jur., p. 593. It is also recognized that an architect ordinarily possesses knowledge superior to that of his client as to approximate costs of building construction. Appellant's initial point is premised upon the foregoing general rules: in effect, that implied by law from relationship of the parties is appellee's duty of full disclosure of his opinion and belief concerning building costs. Concretely stated, that, if Carlander had imparted to defendant's Committee his belief that the building as designed would cost around $20 per sq. ft., to construct; that is, $1,300,000 or more, his plans would never have been approved or contract signed; such failure to disclose giving rise to a right initially to rescind the contract as in fraud or amounting to a mate-

rial breach of the architect's contract if sued thereon; and that its right to issues under the stricken pleading is not foreclosed by jury answers to the other issues submitted, but rather from viewpoint of what the jury might have found on issues inclusive of its stricken defenses. Schuhmacher Co. v. Holcomb, 142 Tex. 332, 177 S.W.2d 951.

■ It is the contention here that even subsequent to the written contract it was plaintiff's duty to disclose his personal opinion of building costs (probably $20.00 per sq. ft.). But in our opinion any such duty implied by law from relationship of the parties was expressed as a contractual obligation under their writing—to make cost estimates upon request; Section 8 providing "When requested to do so, the Architect will furnish preliminary estimates on cost of the work * * *." No such request was ever made even after defendant's knowledge from the Jones-Carlander exchange of letters of August 1950 that the letter was in process of designing "not a certain price building" but one conforming to "certain approved plans". In thus failing to avail themselves of the cost estimate provisions of Section 8, it would appear that defendant's Building Committee took their chances relative to the development by Carlander of plans and specifications that they could use; only the architect's refusal to make cost estimates constituting a breach of the contract.

■ Here we should make reference to the distinction (apparently overlooked by defendant's Committee) between complete *plans* for an approved ten-story building, and *cost* of a completed building as called for by those plans. It was plaintiff's concept of his job, with which the jury agreed, to furnish plans for the entire structure in contemplation, (as per Jones' letter of December 29, 1948), to be presently utilized to the extent that available funds would permit—$600,000. Consistent with that view was his earlier inquiry of Mr. Jones for directions; his letter to

Guy Newman, Assistant to President White, of December 1950 expressing a "feeling" that the contract could be let for part of the building for a little over $700,000; and lastly the 1951 instructions to contractors that "Owner desires to award a contract for the Bible Building within the funds now on hand for this project, for that reason calling for as many alternate bids as possible * * *. As more funds become available, the intention of the Owner at this date is to complete the entire project." We conclude, therefore, that terms of the contract became controlling of plaintiff's obligations thereunder. Accordingly we answer in the negative the law question posed by appellant in supplemental brief of whether he had any obligation under this contract to take into consideration the cost of the building and advise the Committee of the cost. And in the affirmative, appellant's further question of "whether any plans designed by him that conformed to the approved sketches, regardless of cost, would amount to performance of his contract." Applicable to the foregoing conclusion is the rule stated in 3 Am.Jur., p. 185, 1957 Pocket Part: "And where the cost of construction is not fixed in the agreement employing an architect, nor estimated by him, but the plans are prepared according to details dictated by the owner, it has been held that the fact that the plans when completed call for a building which will cost more to erect than the owner expected, or is willing to pay, will not preclude the architect from recovering compensation for his services in making the plans." Citing Laing v. School District No. 10 of Jackson County, 190 Or. 358, 224 P.2d 923.

We have examined the many cases cited by defendant's counsel in support of point 1; in particular Zannoth v. Booth Radio Stations, 333 Mich. 233, 52 N.W.2d 678, where an oral cost limitation was held controlling over previously accepted plans for a broadcasting and radio transmitter station. There, under the fact situation presented, the Court chose to give strict application to the doctrine of full disclosure. Compare, on the other hand, the Texas case of Dudley v. Strain, Tex.Civ. App., 130 S.W. 778, 783, where the architect had sued for services rendered under an oral contract of employment; the issue raised being cost of the proposed structure. Though probably unnecessary to the opinion, the Austin Court had occasion to hold: "As a general rule, it would not have devolved upon appellant to inform the committee that the plans and specifications would involve a cost far in excess of $8,000, though he might have known that they were under the impression that the improvements could be made for that sum. Ordinarily, it would have been their business to have ascertained such fact, and, whatever moral obligations there might have rested upon appellant to inform them of their mistake, it would not have been his legal duty to have done so." Nor in Zannoth's appeal was there such a provision as Paragraph 15 of the architect's contract here, ordering plaintiff "to proceed with the completion of plans and general working drawings" in accordance with specified "preliminary studies" for construction of a large and unique building.

█ Appellant's points 2 through 7 relate to defenses set forth in lengthy pleadings, but stricken by the court as infringing on the parol evidence rule. Generally stated, they complain of the court action in thus striking its defenses involving (a) cost limitation, (b) plaintiff's failure to carry out defendant's instructions, (c) his negligence in failing to consider its known financial resources, and (d) limited authority of Building Committee. In this connection the five sheets of "Preliminary Studies" had been approved and plaintiff ordered to proceed with the completion of specifications and general working drawings in accordance therewith. This contract was executed *before* plaintiff had entered into the job of drawing final plans, etc., which appellant concedes were entire-

ly conformable to the preliminary studies. Any cost limitation was intentionally excluded by all parties to the writing. Where the parties adopt a writing or writings as the final and complete expression of their agreement, the result is an integration, says Restatement, Law of Contracts, Section 288, p. 307, Parol Evidence Rule.

Under the uniform authorities, admissibility of testimony concerning a cost limitation turns on time of the alleged restriction, whether before or after a signing of contract for architectural services. If the owner is left free to decide *after* signing of contract the amount to be spent on the work, evidence to such effect is admissible, the contract being incomplete in such regard. On the other hand, where as here, (contract Sec. 15), the owner's approval and acceptance of "preliminary studies" is based on sketches, drawings and plans descriptive of the structure in contemplation rather than in terms of cost thereof, the contract in writing constitutes a complete integration of oral stipulations of the parties.

Closely analogous to the instant situation is Mitterhausen v. South Wisconsin Conference Ass'n, 245 Wis. 353, 14 N.W.2d 19, 21, as follows: "The trial court erroneously received evidence concerning contemporaneous and prior agreements in respect of the time within which the building was to be completed and the maximum cost at which it was to be constructed. Plaintiff and defendants had extensive negotiations culminating in a contract which, in great detail, purported to deal with the obligations of the owner and those of the architect. This contract covered explicitly the obligations of the architect with respect to the furnishing of professional services and those of the owner in respect of paying compensation to the architect. It presumably was a final expression of the parties' negotiations. * * * It contained no limitation upon the cost of the building, but did contain a provision that 'When requested to do so the Architect will furnish preliminary estimates on the cost of the work, but he does not guarantee the accuracy of such estimates.' Under these circumstances parol evidence of contemporaneous or prior agreements injecting conditions upon the obligation to pay compensation to the architect are presumably inadmissible under the parol evidence rule." And appellant's assertion of a right to orally instruct plaintiff in face of the written contract is to say that said architectural services, though fully detailed, are to be rendered subject to a cost limitation when none was expressed.

■ Moreover, and as regards oral instructions from the owner, the final letter of Chairman Jones (December 29, 1948) is significant; obviously intended to supersede any previous instructions concerning the revised plans. Such letter was in response to one from plaintiff, inquiring in various particulars "as to what is to be included in the new plans, sketches and designs." This reply letter was in like detail, mentioning no cost limitation but expressing hope that the building as outlined could be constructed with money which "will be available." Bueche v. Bickenroht, Tex.Civ.App., 220 S.W.2d 911, is authority for the proposition that where the employment contract, though oral, does not contain a cost limitation but does contain an obligation to design a building according to identified plans, the architect is entitled to compensation, even though the cost exceeds the hopes and expectations of the owner.

Appellant asserts that exclusion of testimony on limitation of cost of the proposed building would lead to absurd results; arguing that without same the architect could fill the building with rare marble, fine carvings and gold leaf, and still be entitled to his contract percentage. The record does not sustain the assumption made; plaintiff here not denying right of the owner under the contract in matter of details and choice of materials consistent with the mutually binding agreement between the parties. The sixth point may be overruled

without further discussion; likewise as to point 7, the stricken allegations alleging no lack of authority to execute the contract here sued upon. Defendant merely differs with our construction of the instrument and reiterates its position that if, as a matter of law, the architect is empowered to proceed with final plans, without regard to a cost limitation, then the Committee had no authority to make it.

Points 8 and 9 relate to claim of improper cross-examination of Dr. White, President of Defendant University, and jury argument in such connection; subject matter being the charges of fraud imputed to plaintiff. We have examined the statements and argument of counsel in support, but same are overruled, considering the wide latitude allowed the cross-examiner where the witness is an interested party.[1] In his jury argument, adverse counsel merely commented on the testimony quoted below in conclusions favorable to plaintiff touching on the defensive allegations of fraud.

Point 10 in turn complains of undue restriction on right of cross-examination, in that the court sustained objections to the defense questioning of plaintiff relative to whether he had told the Committee at their meeting of September 9, 1950 that the proposed building would cost $20 per sq. ft. Background of the ruling was this: Plaintiff, as a witness in rebuttal of defense testimony in chief, was questioned by his own counsel about the previous discussion with members of the Committee at time of contract signing, referring them to the fact that a $20 per sq. ft. cost "had been mentioned." (It will be remembered that at such September 9 meeting plaintiff had taken notes of their discussion on "building cost"; commenting that the Students' Building, built at $10 per sq. ft., would be a "comparable gauge and favorable"). In this setting, defendant's counsel asked plaintiff, on cross-examination: "Did you tell them on September 9 that you thought that it (proposed building) would cost $20.00 per sq. ft.?" Objection thereto was sustained, the

---

1. Typical of defendant's charges against plaintiff of fraudulent representations were: " * * * plaintiff represented * * * that the cost of the proposed building would not be substantially in excess of $600,000.00, which representation was false and was known by plaintiff to be false, or, in the alternative, the falsity * * * could have been discovered by plaintiff * * *. Such fraud and misrepresentations upon the part of plaintiff precludes any recovery by him on said contract." The cross-examination complained of is as follows:

   "Q. (By Mr. Spafford) Have you read the petition, Dr. White, the answer that was filed by Baylor? * * * A. Well, I didn't know that they accused him of straight fraud, I think perhaps he was sincere himself in it, but I think we were misled, whether intentionally or not. * * *

   "Q. Do you think that he intentionally misled anybody? Mr. Guittard: We object, if the Court please, to this witness's conclusion about the party's intentions.

   "Mr. Spafford: This is cross-examination, isn't it?

   "The Court: You can ask him how he feels about—whether he intentionally misled him. He wouldn't know how the other fellow took it.

   "Mr. Spafford: Note our exception.

   "Q. (By Mr. Spafford) Now, do you think that Mr. Carlander here intentionally misled you? * * * A. Well, I think that he didn't disclose all of the facts to us which we were entitled to, but I don't think in his heart he meant to deceive, no.

   "Q. You don't think that he is that kind of a man, do you, Mr. White? A. Well, I have a high opinion of him as an individual.

   "Q. And you don't think that he would try to intentionally deceive you, do you? A. I think in his enthusiasm to have his way about the plans, that he wasn't careful enough to keep us fully informed.

   "Q. You think,—in other words, that he was careless, would that be the correct term? A. Yes, I think out of his zeal for the building, he wanted to build, that he just didn't take us fully into his confidence and disclose to us all the facts that came out in that bid.

   "Q. But as to fraud, you wouldn't say that, is that right? A. I wouldn't use the word, no."

court stating the matter had been gone into over a "dozen times." In this the court was mistaken, the witness not having been theretofore questioned on the subject as of such date. To the question an affirmative answer may be assumed, Carlander having just stated that "We had discussed it from July; they had only been on the Committee * * * they did not know." Be this as it may, whether plaintiff did or did not make such statement about the "$20.00 per sq. ft." some six months after the contract was signed, would appear immaterial in view of his testimony already before the court, and the position of defendant officials that the matter of cost must await a completion of the plans and letting of bids. Cross-examination of plaintiff had extended over some 340 pages of the Statement of Facts and it can hardly be said that this mistaken ruling was a restriction on right of cross-examination amounting to an abuse of discretion.

■ The contract provided for a 6% fee, 4½% of which was due upon completion of specifications and general working drawings, computed upon a reasonable cost, or if bids had been received, then upon the "lowest bona fide bid." Under issue 1 the jury award of $68,003.73 was exactly 4½% of the Farnsworth & Chambers bid, rejected by the Committee on advice and acquiescence of plaintiff that same was unreasonably high (issues 23, 24). Appellant candidly admits in points 11 and 12 that such bid was reasonable and bona fide; arguing, however, that an architect may not use as a basis for his fee a bid that has been rejected "because it is for an amount completely beyond the contemplation of the parties when the project was undertaken." Manifestly defendant again seeks to add to the written contract a cost limitation when same was omitted therefrom by express "contemplation" or agreement of the parties. Incidentally, other witnesses on behalf of plaintiff testified that 4% of the lowest bona fide bid was a usual, reasonable and customary fee, if cost of the work be not otherwise

determinable by a completed building. The points are overruled.

Points 13, 14 and 15 may be considered together. They center generally upon issue 1—the jury finding of $68,003.73 as usual, reasonable and customary compensation for *all work* designed and specified by plaintiff and abandoned by defendant. It is claimed that such recovery includes services rendered under the oral contract antedating January 1, 1949; barred by limitation and also by the $6,000 finding of accord and satisfaction (issue 20). In such connection the record reflects the following:

That in original petition filed July 3, 1952 plaintiff had sued on the written contract of March 10, 1949, alleging performance of all services required thereunder and entitled to a fee based on the bid of $1,511,144; in first amended petition filed September 4, 1954, adding the alternative plea that if any work designed or specified by the contract be abandoned, that under subd. 4 the architect is to be paid for the services rendered on account of it; alleging the reasonable value of such service to be $94,085. In second amended original petition filed February 20, 1956, plaintiff alleged for the first time the performance of services running back to 1944, detailing plans designed from 1945 through 1948, valued at $30,000, of which $6,000 had been paid, suing for balance due over that period. For the work designed during 1949 through 1951, he alleged that the usual, reasonable and customary compensation due was $85,000, of which $1,200 had been paid, suing for the balance due over that period. As explanatory of this division of claims, plaintiff alleged: "On or about January 1, 1949 the defendant advised this plaintiff Carlander that it desired to abandon all previous plans, sketches and drawings and requested the plaintiff to make entirely new plans, sketches and drawings and plaintiff commenced work on or about said date to prepare plans and drawings which were subsequently approved on or about March 7, 1949, by defendant and which plans and drawings referred to are identified and made a part of written archi-

tectural contract of employment dated March 10, 1949; that in connection with said new plans, * * *." To all allegations of plaintiff's 1956 pleading for services rendered prior to January 1, 1949 defendant pled the two-year statute of limitation; also in motion for mistrial after verdict, pled the jury answer to issue 20 that "On November 2, 1948 plaintiff and defendant's Building Committee agreed that the $6,000.00 payment theretofore received by plaintiff was full payment for all services rendered by him up to that date." [2]

Defendant therefore asserts that issue 1 seeking a recovery for "all work designed" by plaintiff obviously included work done prior to November 2, 1948 and cannot stand; he being entitled to recovery, if at all, for services rendered subsequent to such date in form of an express jury finding.

Appellee's answer to the foregoing points was in effect that limitation would not apply to a recovery for services performed before January 1949 because only one continuous contract of employment was involved; also that his 1956 amended petition alleging for the first time these prior services, was not a "new, distinct or different transaction and occurrence," under Art. 5539b, Vernon's Ann.Civ.St. But in our opinion he did not so plead, alleging on the other hand abandonment of performance of the oral contract on said date and an "entirely new" project undertaken.

However, appellant did not object to the form of issue 1 as inclusive of services antedating the contract, hence waiving the particular objections. Rule 272, Texas Rules of Civil Procedure; 3–A Tex. Jur., p. 220. The contract, sec. 4, provided

for payment in case "any work" designed or specified by the architect be abandoned by the owner. And to say that the jury finding of $68,003.73 comprehended these prior services would result in irreconcilable conflict with issue 20, which is not to be presumed, Casualty Underwriters v. Rhone, Tex.Com.App., 134 Tex. 50, 132 S.W.2d 97; and consistent with the jury verdict plaintiff had testified that the amount due him for services pursuant to his dated contract of employment was $68,003.73.

Point 16: Issue No. 1 is also complained of as requiring the jury to find the usual, reasonable and customary compensation due plaintiff, rather than the value of plaintiff's services. Manifestly, under the latter wording, it could have been logically argued that plaintiff's services had no reasonable value; defendant receiving no benefit therefrom, since it did not use the plans. Colbert v. Dallas Joint Stock Land Bank, 136 Tex. 268, 150 S.W.2d 771, 776, is strongly relied upon, the decision holding erroneous the trial court's submission of an issue inquiring of the usual and customary agent's commission for sale of land, having sued only for "reasonable value of plaintiff's services"; that in a suit on quantum meruit for services rendered the law fixes the measure of recovery, implying a promise to pay the reasonable value thereof; and approving the statement of Brady v. Richey & Casey, Civ. App., 187 S.W. 508, 513, that "in determining what is reasonable under the circumstances of a given case, the end accomplished, as well as the time and effort expended, should be taken into consideration."

But plaintiff's suit is on a written contract for the 4½% feet stipulated,

2. Embodied in plaintiff's motion for judgment, was a prayer that above issue 20 and answer be wholly disregarded on many grounds; for example, that defendant had pled and the undisputed evidence disclosed the $6,000 payment to be a credit on the written contract rather than payment for past services; that all discussions about the $6,000 payment were a part of the negotiations looking to draft-

ing of the written contract, became merged therein, and that evidence relative thereto was violative of the parol evidence rule. While appellee's motion for judgment was sustained, the court made no reference to issue 20 and jury answer; and same having support in the testimony, must be duly considered as a jury finding.

or, in the alternative, under sec. 4 providing that if any work designed or specified is abandoned, the architect is to be paid for his services rendered on account of it. More in point with the instant situation is Cooper v. Gordon, Tex.Civ.App., 23 S.W. 608, 609, where witness architects were heard to show that a charge of 3½% on value of the buildings was reasonable and customary; the court holding that reasonable compensation is determined "by what the general rule may be as to charges for such labor among members of the certain craft, occupation, or profession * * *." We agree with appellee's further statement of principle as applicable here, that "The true test is not the value of the services of the defendant, as appellant contends, but what such services sell for in the market, or synonymously stated, what the usual, reasonable and customary compensation is for such services."

The nature and importance of all points presented has resulted in an opinion of regrettable length; but having found no error in the record deemed reversible, the judgment of the trial court is in all respects affirmed.

Affirmed.